IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

COLETTE J. SELLE             )
                                    )
v.                              )     No. 3:14-1543
                                    )     Judge Trauger/Bryant
SOCIAL SECURITY ADMINISTRATION     )

To:    The Honorable Aleta A. Trauger, District Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for disability insurance benefits, as provided under Title II of the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 13), to which defendant has responded (Docket Entry No. 15). Plaintiff has further filed a reply in support of her motion for judgment. (Docket Entry No. 16) Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 11),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this Report.

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

# I. Introduction

Plaintiff filed her application for benefits on June 23, 2010, alleging a disability onset date of March 19, 2009. (Tr. 25) Plaintiff's claim was denied at the initial and reconsideration stages of state agency review. Plaintiff subsequently requested *de novo* review of her claim by an Administrative Law Judge (ALJ). The case came to be heard by the ALJ on November 13, 2012, when plaintiff appeared with counsel and gave testimony. (Tr. 45-67) Testimony was also received from an impartial vocational expert. At the conclusion of the hearing, the ALJ took the matter under advisement until January 17, 2013, when she issued a written decision finding plaintiff not disabled. (Tr. 25-37) That decision contains eight enumerated findings, the first five of which are relevant here:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since March 19, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the cervical spine, left shoulder disorder, fibromyalgia, major depressive disorder, panic disorder with agoraphobia, and history of substance abuse disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; frequently reach overhead with both upper extremities; occasionally climb ramps/stairs,

balance, stoop, kneel, crouch, and crawl; and never climb
ladders/ropes/scaffolds. The claimant can understand, remember, and carry
out simple and detailed instructions; maintain concentration, pace, and
persistence for at least 2 hours at a time during an 8-hour workday;
occasionally interact with the public, co-workers, and supervisors; and adapt
to infrequent change in the workplace.

(Tr. 27, 29) Following plaintiff's appeal of the ALJ's decision to the SSA's Appeals Council,

these five findings were affirmed. The following additional findings were made by the

Appeals Council:

6.      The claimant is not able to perform past relevant work as accounting assistant,
        personnel administrator, personnel manager, payroll administrative clerk, and
        accounts payable clerk.

7.      The claimant's date of birth is August 20, 1970. Her age is defined as a
        "younger individual" throughout the period at issue and she has a high school
        education.

8.      Transferability of work skills is not material to the determination of disability.

9.      Based on the claimant's age, education, and work experience, and residual
        functional capacity, and using Medical-Vocational Rule 202.21 as a framework
        for decision-making, the claimant is not disabled.

10.     The claimant is not disabled as defined in the Social Security Act at any time
        from March 19, 2009, her alleged onset date, through January 17, 2013, the
        date of the Administrative Law Judge's decision.

(Tr. 6-7)

        The Appeals Council's decision is the final decision of the SSA, dated July 24,

2014. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §

405(g). If the agency's findings are supported by substantial evidence, based on the record as

a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following review of the record is taken from plaintiff's brief, Docket Entry No. 14 at pp. 2-12:

### 1. Age, Education, and Work History

Ms. Selle, a high school graduate born in 1970 (Tr. 47), was 38 years old at her onset. Her past relevant work was as an accounting assistant, a personnel administrator, a personnel manager, a payroll administrative clerk, and an accounts payable clerk (Tr. 62).

### 2. Relevant Medical Evidence

#### a. Jeffrey Scott Jordan, M.D. – Treating Family Practitioner

On March 9, 2010, Ms. Selle was evaluated by Dr. Jordan for complaints of anxiety, depression, and pain in her neck, back, and left arm (Tr. 362-364). She reported feeling stressed, overwhelmed, and tired, and described difficulty sleeping (Tr. 362). An exam revealed weakness of the left upper extremity with empty can test and painful diminished range of motion (Tr. 363). Dr. Jordan increased Ms. Selle's Paxil dose and referred her to a pain clinic. *Id.*

At a follow-up visit on March 25, 2010, Ms. Selle reported no improvement in her symptoms (Tr. 358-361). She was prescribed Ambien (Tr. 360). On July 15, 2010, Paxil was discontinued and Ms. Selle was started on Celexa and Xanax (Tr. 357). On August 12, 2010, Ms. Selle reported high stress, depression, sleep disturbances, anxiety, and moodiness (Tr. 355-356). She was prescribed Elavil and her dose of Celexa was increased (Tr. 356). Dr. Jordan referred Ms. Selle to a psychiatrist and a neurologist. *Id.*

Ms. Selle was evaluated by neurologist Bruce S. Rubinowicz, D.O., on August 24, 2010 (Tr. 297-299). She complained of ongoing difficulties with sleep, including falling asleep, staying asleep, and daytime drowsiness (Tr. 297). She indicated that Ambien helped her fall asleep, but she continued to experience periods of wakefulness after sleep onset. *Id.* A physical examination revealed multiple tender points (Tr. 298). Dr. Rubinowicz stated that there was no

obvious concern for an underlying sleep disorder, but she might have fibromyalgia (Tr. 299).

He suspected Ms. Selle's mood disorders were contributing to her insomnia and sleep

difficulties, as well as to her intrusive daytime sleepiness. Ms. Selle was prescribed Savella

and was educated on the importance of avoiding napping during the day. *Id.*

Ms. Selle returned to Dr. Rubinowicz for a follow-up evaluation regarding ongoing

issues

with diffuse muscle and joint pain on October 29, 2010 (Tr. 296). She reported that her

orthopedic surgeon found no structural issues related to her pain and agreed that there was likely

an underlying issue of fibromyalgia. Plaintiff's Savella dosage was increased. *Id.* She was

prescribed Lyrica on November 15, 2010 (Tr. 295). On January 14, 2011, Ms. Selle reported

feeling better overall, but she continued to experience persistent muscle fatigue (Tr. 293). Her

Lyrica dose was increased. *Id.* Ms. Selle returned to Dr. Rubinowicz on May 17, 2011 (Tr. 488-

489). She reported continued discomfort and some increased difficulties with excessive daytime

sleepiness (Tr. 488). Her Lyrica dose was once again increased (Tr. 489). She reported continued

sleep difficulties on June 7, 2011, and was prescribed Lunesta (Tr. 491-492).

**b. Comprehensive Pain Specialists**

Ms. Selle began treatment at Comprehensive Pain Specialists on April 22, 2010 (Tr. 287-

289). She complained of headaches, as well as pain in her back, neck, and left shoulder (Tr.

679). She also reported difficulty sleeping due to her pain, which was always present. She

described the pain as aching, throbbing, and sharp. Ms. Selle stated that the pain was worse with

lying down, bending or stooping, and lifting or carrying heavy loads. *Id.* An examination

revealed tenderness and spasm of the lumbosacral musculature (Tr. 680). Cervical and lumbar

MRIs were recommended. *Id.*

The cervical MRI, performed on May 19, 2010, showed reversed lordosis, and a central

disc protrusion at C4-5 producing shallow ventral impression on the cervical cord (Tr. 241, 291,

and 712). A lumbar MRI was normal (Tr. 240, 290). On May 26, 2010, Ms. Selle was prescribed Lortab, Zanaflex, and Ibuprofen (Tr. 284-286). Physical examination findings remained unchanged from her previous visit. *Id.*

Ms. Selle was administered a series of cervical epidural steroid injections starting on July 15, 2010 (Tr. 400-403, 395-396). However, she reported no improvement in her pain during a follow-up visit on August 18, 2010 (Tr. 661-663). Subsequent progress notes also showed no significant changes in Ms. Selle's conditions through January 4, 2012 (Tr. 386-394).

On March 28, 2012, Ms. Selle reported persistent neck pain radiating into both upper extremities (Tr. 637-639). Her pain medications were adjusted (Tr. 637). She was subsequently treated with cervical medial branch steroid injections on April 16, 2012 (Tr. 634-636) and May 2, 2012 (Tr. 632-633). Despite this, Ms. Selle reported continued radicular symptoms down her left arm during a follow-up visit on June 20, 2012 (Tr. 623-625). She underwent additional cervical epidural injections on July 23, 2012 (Tr. 621-622) and August 6, 2012 (Tr. 618-620).

### c. Jerry S. Wilson, M.D. – Treating Psychiatrist

Ms. Selle was admitted to the partial hospitalization program at Skyline Madison Campus on March 10, 2011 (Tr. 379-383). Upon admission, she was evaluated by Dr. Wilson (Tr. 379-381). Ms. Selle reported severe anxiety, depression, panic attacks, auditory hallucinations, feelings of hopelessness, and passive thoughts of death (Tr. 379). A mental status examination revealed a depressed mood, an anxious affect, tangential thought processes, and limited insight and judgment (Tr. 380). Ms. Selle's GAF score was 40 to 45 and she was diagnosed with major depressive disorder, provisional, rule-out with psychotic features and panic disorder without agoraphobia. Xanax, Ambien, and Wellbutrin were discontinued and Klonopin and Remeron were prescribed. *Id.*

On July 12, 2011, Ms. Selle reported ongoing anxiety and depression (Tr. 552). A mental

status examination revealed a depressed, anxious, and dysphoric/tearful mood, limited insight and judgment, and impaired memory and cognition. Trazodone, Lunesta, and Abilify were discontinued. Her Lamictal dosage was increased and her Remeron dosage was decreased. *Id.* On October 25, 2011, Ms. Selle reported an overall improvement in her mood, but she continued to struggle with low energy, increased anxiety, and hypersomnia (Tr. 550). Remeron and Ambien were discontinued and Seroquel was prescribed. *Id.* Subsequent notes document no significant changes in Ms. Selle's conditions through February 21, 2012 (Tr. 546-549).

Dr. Wilson completed a Psychiatric/Psychological Impairment Questionnaire on November 22, 2011 (Tr. 532-539). He diagnosed recurrent major depressive disorder, moderate with psychotic features, and panic disorder without agoraphobia (Tr. 532). Ms. Selle's GAF score was 50 and her prognosis was guarded. *Id.* Clinical findings included poor memory, appetite disturbance with weight change, sleep disturbance, recurrent panic attacks, perceptual disturbances, oddities of thought, perception, speech, or behavior, mood disturbance, emotional lability, decreased energy, hallucinations, anhedonia/pervasive loss of interests, feelings of guilt/worthlessness, hostility and irritability, difficulty thinking/concentrating, generalized persistent anxiety, and suicidal ideation or attempts (Tr. 533). Dr. Wilson indicated that Ms. Selle had required hospitalization for her symptoms (Tr. 534).

Dr. Wilson opined that Ms. Selle was markedly limited (defined as effectively precluded) in her ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 534, 536). Ms. Selle was found moderately limited (defined as significantly limited, but not totally precluded) in the ability to remember locations and work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and, set realistic goals or make plans independently (Tr.

534-537). In addition, Ms. Selle experienced episodes of deterioration or decompensation in work or work-like settings that caused her to withdraw from that situation and/or experience an exacerbation of signs and symptoms (Tr. 537). Dr. Wilson found Ms. Selle is not a malingerer (Tr. 538). Her psychiatric conditions exacerbated her fibromyalgia. Ms. Selle had good days and bad days. *Id.* Dr. Wilson estimated that Plaintiff would be absent from work more than three times a month, on average, as a result of her impairments or treatment (Tr. 539).

Ms. Selle returned to Dr. Wilson complaining of an increase in her depressive symptoms on April 13, 2012 (Tr. 545). She reported increased isolation, low energy/anhedonia, and poor sleep. A mental status examination revealed Ms. Selle had an anxious and dysphoric mood. Dr. Wilson diagnosed major depressive disorder: psychosis vs. bipolar. Seroquel was discontinued. *Id.* Ms. Selle reported improvement in her symptoms at subsequent visits on May 18, 2012 (Tr. 597) and June 12, 2012 (Tr. 596).

However, when Ms. Selle returned to Dr. Wilson on August 7, 2012, she reported increased depressive symptoms and auditory hallucinations (Tr. 614-616). A mental status examination revealed auditory hallucinations and a depressed and anxious mood (Tr. 615). No significant changes in her condition were found on September 4, 2012 (Tr. 610-614). On October 9, 2012, Ms. Selle reported a low mood, escalating irritability, refractory insomnia, and occasional passive suicidal ideation (Tr. 606-609). Mental status examination findings were unchanged from the previous visit. Ms. Selle was continued on Lithium, Cymbalta, Lamictal, and Ambien. *Id.*

### d. Gary Lee, Psy.D. – Treating Psychologist

Ms. Selle presented to Dr. Lee for an initial evaluation on September 9, 2010 (Tr. 323-326). She complained of depression, anger, anxiety, feelings of hopelessness, passive death wishes, difficulties with anhedonia, lack of attention/concentration, decreased libido, and loss of interests (Tr. 323). A mental status examination revealed anxious behavior and a depressed and

anxious mood (Tr. 325). Dr. Lee diagnosed anxiety disorder; major depressive disorder, recurrent, severe without psychotic features; and personality disorder (Tr. 326). Ms. Selle's GAF score was 55. Subsequent records document that Ms. Selle attended individual psychotherapy sessions with Dr. Lee on a bi-weekly basis from September 14, 2010 through April 12, 2011 (Tr. 418-430).

Ms. Selle's treating social worker at the same office, Edward Brinson, LCSW, completed a Psychiatric/Psychological Impairment Questionnaire on November 21, 2011 (Tr. 523-530). He diagnosed major depression and generalized anxiety and indicated that Ms. Selle's GAF score was 55-60 (Tr. 523). Her prognosis was guarded as Mr. Brinson indicated that despite two partial hospitalizations and consistent participation in group and individual therapy, Ms. Selle's symptoms persisted. *Id.* Ms. Selle exhibited poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional lability, recurrent panic attacks, anhedonia/pervasive loss of interests, paranoia/inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking/concentrating, suicidal ideation or attempts, hostility and irritability, generalized persistent anxiety, decreased energy, and social withdrawal/isolation (Tr. 524).

Mr. Brinson opined that Ms. Selle was markedly limited in her ability to remember locations and work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain ordinary routine without supervision; and, complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 526-527). He also opined that Ms. Selle was markedly limited in the ability to interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors;

get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and travel to unfamiliar places or use public transportation (Tr. 527-528).

In addition, it was found that Ms. Selle experienced episodes of deterioration or decompensation in work or work-like settings that caused her to withdraw from that situation and/or experience an exacerbation of signs and symptoms due to dissociative episodes and anxiety (Tr. 528). Mr. Brinson agreed with Dr. Wilson that Plaintiff is not a malingerer and that her psychiatric conditions exacerbated her physical pain (Tr. 529). It was Mr. Brinson's opinion that Ms. Selle was incapable of tolerating even low work stress due to her anxiety. She had good days and bad days. *Id.*

Mr. Brinson wrote a letter on November 21, 2011, wherein he indicated that while Ms. Selle had made some progress in her treatment, she was still unable to function consistently on a day-to-day basis (Tr. 436).

### e. Susan R. Vaught, Ph.D. – SSA Consultative Examiner

Dr. Vaught evaluated Ms. Selle at the request of the Social Security Administration on August 25, 2010 (Tr. 243-246). Ms. Selle reported symptoms of depression and severe anxiety following a work-related accident in 2004 (Tr. 243). She reported feeling guilty most of the time, poor libido, a decline in appetite, and feeling too fatigued to do anything (Tr. 244). A mental status examination revealed a depressed and anxious mood, restless motor behavior, jerky movements, mild persecutory delusions, and poor insight. Based on the evaluation results, Dr. Vaught assessed Ms. Selle's GAF score at 50 (Tr. 245). She opined that Ms. Selle had moderately impaired memory and concentration, that she could have severe problems sustaining a consistent work schedule, that she would have difficulty interacting appropriately with coworkers and supervisors, and she would likely have moderate trouble adapting to changes in routine and/or job requirements due to her mood issues and difficulties in concentration (Tr. 245-

246). Dr. Vaught stated that it was unclear whether the assessed limitations were related to substance abuse (Tr. 246).

### f. Albert J. Gomez, M.D. – SSA Consultative Examiner

Plaintiff was evaluated by Dr. Gomez at the request of the Administration on September 13, 2010 (Tr. 248-250). She reported multiple injuries following a work related accident in 2004 (Tr. 248). She described sharp, severe, and constant pain increased with lifting, bending, standing, turning her head, and reaching. *Id.* A an examination revealed marked tenderness of the left shoulder, decreased abduction and forward elevation of the bilateral shoulders, tenderness to palpation of both hips, 4/5 motor strength in the upper extremities, positive straight leg raising test bilaterally in the lying position, moderate tenderness to palpation of the lumbar spine, and decreased lumbar flexion (Tr. 249-250). Dr. Gomez opined Ms. Selle could occasionally lift 20 pounds in an eight-hour workday and could stand or sit for at least six hours in an eight-hour workday (Tr. 250). He also opined that Ms. Selle would have difficulty with reaching and with lifting overhead. *Id.*

### 3. Relevant Portion of Ms. Selle's Testimony

Ms. Selle testified that she was injured at work in 2004 (Tr. 48). She sustained injuries to her neck, lower back, and left shoulder (Tr. 49-50). She attempted to return to work after the accident, but could not handle the stress of the job because she was very depressed, slept all the time, had crying episodes, and vomiting (Tr. 49). She testified that her depression became much more severe after she stopped working (Tr. 58). She is always sad and cries often. She doesn't eat at times and sleeps a lot. She testified that she hears voices and feels as though people are watching her. Ms. Selle stated that she rarely leaves her house due to severe anxiety attacks. *Id.* She reported having no friends or social life (Tr. 60). Her husband helps with most of the household chores (Tr. 59). She indicated that she gets out of the house to grocery shop about two times a week, but her husband has to force her to do so (Tr. 60).

Ms. Selle testified that despite taking medication, she experiences neck, back, and shoulder pain on a daily basis (Tr. 53). She described the pain as sharp, stabbing, and constant. *Id.* She stated that she can sit up to one hour at a time before she needs to get up and move around (Tr. 56). She can walk twenty to thirty minutes at a time and stand five to ten minutes at a time before she needs to sit down to rest (Tr. 57). Ms. Selle further testified that she has difficulty turning her neck and can lift at most, a gallon of milk due to numbness and tingling in her hands (Tr. 51 and 56).

**4. Relevant Portion of Vocational Expert's Testimony**

The Vocational Expert ("VE") testified that an individual of Ms. Selle's age, education, and work history who could lift and/or carry 20 pounds occasionally and ten pounds frequently; stand and/or walk six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently reach overhead with both upper extremities; understand, remember and carry out simple and detailed instructions; maintain concentration, pace and persistence for at least two hours at a time during an eight-hour workday; occasionally interact with the general public, co-workers or supervisors; and adapt to infrequent change in the work place, could perform Ms. Selle's past relevant work as an accounting assistant, a personnel administrator, a personnel manager, a payroll administrative clerk, and an accounts payable clerk (Tr. 62-63).[2] Such an individual could also perform other work as a general clerk, a file clerk, and an office helper (Tr. 63). The VE testified that an individual with the same limitations, except that she could only occasionally reach overhead; understand, remember, and carry out

---

[2]Because the VE testified that this past relevant work was skilled, but the limitation to maintaining concentration, persistence or pace for at least two hours at a time does not support the ability to perform more than semi-skilled work, the Appeals Council found that the ALJ was not entitled to rely on the VE's testimony that plaintiff's past relevant work was not precluded by her RFC, and instead made its own findings at the fifth step of the sequential evaluation process.  (Tr. 6-7)

simple and detailed instructions; maintain concentration and persistence for at least two hours at a time during an eight-hour workday; an inability to maintain a consistent pace without an unreasonable number and length of rest periods; no more than occasional interaction with the general public, co-workers and supervisors; and the ability to adapt to infrequent change in the workplace, could not perform any of Ms. Selle's past work or any other full-time job due to the pattern of breaks to rest (Tr. 64). In fact, the VE stated that an individual who was unable to maintain a persistent pace without an unreasonable number and length of rest periods would be precluded from working solely due to this restriction (Tr. 66).

## III. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the record contains substantial evidence that could have supported an opposite conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. E.g., Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir. 2005). Accordingly, while this court considers the record as a whole in determining whether the SSA's decision is substantially supported, it may not review the case de novo, resolve conflicts in the evidence, or decide questions of credibility. See Bass v. McMahon, 499 F.3d

506, 509 (6th Cir. 2007); <u>Garner v. Heckler</u>, 745 F.2d 383, 387 (6th Cir. 1984).

B. <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." <u>Id.</u> at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

<u>Cruse v. Comm'r of Soc. Sec.</u>, 502 F.3d 532, 539 (6th Cir. 2007)(<u>citing</u>, <u>e.g.</u>, <u>Combs v. Comm'r of Soc. Sec.</u>, 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff argues that the ALJ failed to properly weigh the opinion evidence from plaintiff's mental health care providers pursuant to applicable regulations and rulings, and further argues that the ALJ failed to properly evaluate plaintiff's credibility. As further explained below, the undersigned agrees that the ALJ erred in her weighing of the opinion

evidence, and that reversal and remand is required on that basis.

The SSA's regulations provide the framework for weighing opinion evidence, assigning "progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Gayheart v. Comm'r of Soc. Sec., 710 F.3d 365, 375 (6th Cir. 2013) (quoting Soc. Sec. Rul. No. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)). "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), [20 C.F.R. ] § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"), id. § 404.1502, 404.1527(c)(2)." Id. As the Sixth Circuit has explained, the opinions of a treating source are to be reviewed deferentially:

> The Commissioner has elected to impose certain standards on the treatment of medical source evidence. 20 C.F.R. § 404.1502. Under one such standard, commonly called the treating physician rule, the Commissioner has mandated that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527[(c)]. If the ALJ declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527([c])(2)).

Importantly, the Commissioner imposes on its decision makers a clear duty to

"always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion." 20 C.F.R. § 404.1527([c])(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996). This requirement is not simply a formality; it is to safeguard the claimant's procedural rights. It is intended "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that [ ]he is not." Wilson, 378 F.3d at 544. Significantly, the requirement safeguards a reviewing court's time, as it "permits meaningful" and efficient "review of the ALJ's application of the [treating physician] rule." Id. at 544-45.

Cole v. Astrue, 661 F.3d 931, 937-38 (6th Cir. 2011).

In the instant case, the ALJ offered the following analysis of the medical opinions on the subject of plaintiff's mental ability to do work-related activities:

The undersigned gives great weight to the opinions of Ms. LaVasque, Dr. Vaught, Dr. Jackson, and Dr. Grand because their assessments are consistent with the medical evidence as a whole. The undersigned gives little weight to the opinion of Mr. Brinson as he is not an acceptable medical source. His opinion is inconsistent with the evidence and his opinion was largely based on the claimant's subjective reports. The undersigned gives great weight to the opinion of Dr. Wilson regarding concentration limitations but little weight to social interaction because the evidence indicates the claimant is more limited in her social interaction.

(Tr. 36) Dr. Wilson is plaintiff's treating psychiatrist. In discussing Dr. Wilson's November 22, 2011 medical source statement, the ALJ accurately recited all of the functional domains which were assessed as "mildly limited" and "moderately limited." She also accurately recited the one domain of mental functioning which Dr. Wilson assessed as "markedly

17

limited," noting that "Dr. Wilson also assessed marked limitation (effectively precludes the activity) in the claimant's ability to complete a normal workweek and perform at a consistent pace." (Tr. 36, 536) Finally, the ALJ recognized Dr. Wilson's opinion that plaintiff would likely be absent from work more than three times a month on average, due to her mental impairments or treatment. (Tr. 36, 539)

Despite recognizing these opinions and giving "great weight to the opinion of Dr. Wilson regarding concentration limitations," the ALJ ignored the marked limitation which was assessed as part of plaintiff's "concentration limitations." The opinion of the treating social worker, Mr. Brinson, also recognized this marked limitation. (Tr. 527) Moreover, the consultative examiners, Ms. LaVasque and Dr. Jackson, opined that plaintiff "may have moderate to severe problems sustaining a consistent work schedule." (Tr. 245-46) When the ALJ included this marked limitation in a hypothetical question to the vocational expert, stating that the hypothetical individual "is not able to maintain consistent pace without an unreasonable number and length of rest periods" (Tr. 64), the expert testified that such a limitation would preclude plaintiff's past relevant work as well as any other full-time work in the economy. Id. The ALJ ultimately found that plaintiff was essentially moderately limited by her mental impairments, and determined that her RFC aligned with the assessments of the nonexamining state agency psychological consultants, who did not find plaintiff to be markedly limited in any realm of mental functioning.

However, the undersigned must conclude that the marked limitation assessed by the treating psychiatrist may not be swept under the rug, as it appears to have been here. A very similar scenario played out in Young v. Comm'r of Soc. Sec., 351 F.Supp.2d 644 (E.D.

Mich. 2004), where the ALJ appeared to have ignored findings in a report which indicated that the claimant could not work at a competitive pace, as the report at large was discussed in the ALJ's decision and relied upon, but no reason was given for rejecting the particular findings that indicated the need for a reduced pace. The ALJ in <u>Young</u> also presented this limitation in a hypothetical question to a vocational expert, and the expert testified that it may preclude competitive employment. The court concluded that reversible error had been committed, finding as follows:

> Neither this Court nor the ALJ "may [] focus and base [its] decision entirely on a single piece of evidence, and disregard other pertinent evidence." Certainly the ALJ is entitled to weigh the evidence and make credibility determinations, as he did in evaluating the plaintiff's own testimony, and he may incorporate those findings into a hypothetical question to the vocational expert. However, he may not pick and choose the portions of a single report, relying on some and ignoring others, without offering some rationale for his decision.

<u>Id</u>. at 649 (internal citations omitted).

The government argues in its brief that "a fair reading" of the ALJ's weighing of the opinion evidence, "[w]hen viewed in the context of the entire decision," indicates that she did in fact reject Dr. Wilson's assessment of marked limitation in plaintiff's ability to complete a workweek uninterrupted and to perform at a consistent pace with normal breaks, as well as Dr. Wilson's opinion that plaintiff would be absent from work more than three times per month, based on the ALJ's "belie[f] that the medications were effectively treating Plaintiff's condition." (Docket Entry No. 15 at 6-7) However, "while the ALJ's decision might be defensible on proper articulation, the Court's role is not to search out and supply an underpinning for affirmance." <u>Tarter v. Colvin</u>, 2015 WL 4972933, at *6 (E.D. Ky. Aug. 18,

2015).  As in Tarter, the ALJ here did not discuss or differentiate the parts of Dr. Wilson's opinion which would support plaintiff's claim to disability, and this Court should not supply that discussion by reference to external factors identified in the government's brief.  Id.  The ALJ erred in failing to provide good reasons for the weight given the treating psychiatrist's opinion, and the error is not harmless.  In such circumstances, this circuit "does not hesitate to remand[.]"  Gayheart, 710 F.3d at 380.

This case should be reversed and remanded to the SSA for further consideration of the opinion evidence and the issuance of a new decision.

## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this Report.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 14th day of September, 2015.


 s/ John S. Bryant                  
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE